UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JOSEPH CASEY,

                                    Plaintiff,

               v.                                          1:04-CV-1469
                                                           (LEK/GJD)

COMMISSIONER OF SOCIAL SECURITY,
                                    Defendant.
_____

ROBERT C. DEMPF, ESQ., Attorney for Plaintiff
WILLIAM H. PEASE, ESQ., Asst. U.S. Attorney for Defendant

GUSTAVE J. DIBIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the

Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28

U.S.C. § 636(b) and Local Rule 72.3(d).

## PROCEDURAL HISTORY

Plaintiff filed applications for disability insurance benefits and supplemental

security income on June 8, 1999.  (Administrative Transcript ("T.") at 108-10; *see* T.

49).  The applications were denied initially and on reconsideration, and a request for

a hearing was made.  (T. 21, 23).  A hearing was held before an Administrative Law

Judge ("ALJ") on June 14, 2000.  (*See* T. 38-41, 49).  In a decision dated September

26, 2000, the ALJ found that plaintiff was not disabled.  (T. 46-59).  Plaintiff

appealed to the Appeals Council.  (T. 60).

On August 31, 2001, the Appeals Council remanded the matter to the ALJ.  (T.

61-64).  A hearing was held before an ALJ on June 5, 2003, followed by a supplemental hearing on November 5, 2003.  (T. 655-708).  In a decision dated January 29, 2004, the ALJ found that plaintiff was not disabled.  (T. 7-20).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on October 21, 2004.  (T. 3-5).

## CONTENTIONS

The plaintiff makes the following claims:

(1) Plaintiff's physical, mental, and emotional limitations were not properly considered, evaluated, and discussed.  (Brief, pp. 5-10).

(2) The ALJ improperly failed to give controlling weight to the treating physician's opinion.  (Brief, pp. 11-14).

(3) The new evidence submitted to the court should be considered.  (Brief, p. 15).

The defendant argues that the Commissioner's determination is supported by substantial evidence in the record, and must be affirmed.

## FACTS

**A.**   **Non-Medical Evidence and Testimony:**

Plaintiff, who was forty-nine years old at the time of the hearing held on June 5, 2003, completed the eleventh grade.  (T. 136, 675).  Plaintiff is divorced and has a daughter who does not live with him.  (T. 676).  Plaintiff has a girlfriend who stays with him on the weekends in his apartment.  (T. 676, 679).

Plaintiff's past work experience includes cleaning windows and driving a

cement truck.  (T. 143, 663).  At the hearing held on June 5, 2003, plaintiff stated

that he was working between twenty and thirty hours a week, cleaning windows, and

waxing and stripping floors.  (T. 676-77).  He testified that he tried looking for work,

but has a "bad" memory, and is unable to work full-time because he is worried about

having a seizure.  (T. 678, 693-94).  However he later stated that ***he has no

"problem" with his seizures*** as long as he takes his medication and that he has not

had a seizure in almost one year.  (T. 682, 693) (emphasis added).  He later admitted

that he would be able to perform ***any*** job that allowed him to avoid heights and avoid

situations where he would endanger others if he had a seizure, explaining, "***I'm a

good worker . . . I could actually do anything***."  (T. 693-94) (emphasis added).

Plaintiff's attorney added, "***He could do anything***, Judge," and plaintiff reiterated,

"***I'm a good worker***, you know."  (T. 694) (emphasis added).

Plaintiff testified that he cleans, mops, vacuums, does laundry, cooks, does

yard work, swims, fishes, and visits with friends.  (T. 681-82, 689-90).  Plaintiff

stated that he does not have a drivers' license and travels by bus or is driven by his

girlfriend.  (T. 680).  He testified that his day consists of drinking a "few cups of

coffee," vising his sister, working, "sit[ting] around," and watching an average of

"maybe" four hours of television every night.  (T. 679, 681).

## B.   <u>Medical Evidence</u>

Plaintiff alleges that he became disabled on May 3, 1999 due to seizures,

memory loss, confusion, pain, liver disease, hepatitis C, dizziness, nausea, and

ringing in the ears.  (T. 130).

3

Hospital records indicate that between July of 1997 and May of 1999, plaintiff was treated for seizures on several occasions at Albany Memorial Hospital, Albany Medical Center Hospital, and Samaritan Hospital. (T. 166-299, 421-508). The records reflect that, at times, plaintiff was not taking his antiepileptic medication, Dilantin. (*See id.*).

Tests performed during this time period appear to show somewhat different results. EEG testing performed in July of 1996 showed "abnormal" results "because of the intermittent rhythmic delta." (T. 165). The report states that "clinical correlation is indicated." (T. 165). In July of 1997, EEG testing showed normal results while CT testing revealed a "left-sided arachnoid cyst adjacent to the left cerebellar hemisphere." (T. 177, 188). EEG testing performed two months later in September of 1997 showed a "[m]ildly abnormal record demonstrating rare focal cortical irritability, left temporal." (T. 517). CT testing performed in January of 1998 showed a "well defined CSF-equivalent density noted in the left side of the posterior fossa overlying the left cerebellar hemisphere." (T. 222). Similarly, MRI testing performed in June of 1998 showed an "elongated left posterior fossa arachnoid cyst," while EEG testing performed the same day showed normal results. (T. 505-06). A CT test performed in May of 1999 showed a "small arachnoid cyst in the posterior fossa on the left." (T. 295). Another EEG done on April 11, 2000 was normal. (T. 582).

On July 21, 1999, plaintiff went to St. Peter's Hospital complaining of ringing in his ears and the sensation that his "balance is off." (T. 347). Dr. James Wilson

diagnosed plaintiff as suffering from seizure disorder.  (T. 348).  During a follow-up visit three months later, Dr. Wilson found it "difficult" to determine the "exact" etiology of plaintiff's seizure disorder, noting that the cause may be due to alcohol withdrawal or epilepsy.  (T. 346).  Plaintiff returned approximately one month later on November 18, 1999 and complained that he was experiencing a "'seizure type disorder' upon awakening from a nap or bed time - or in middle of night. (T. 343). Dr. Wilson's report also states that plaintiff is disoriented and makes no sense."[1]  (T. 343).  Dr. Wilson recommended that plaintiff continue taking Dilantin and found, "At this time, I feel [plaintiff] is not employable."  (T. 344).

Dr. Wilson's notes state that he discussed with plaintiff "the negative impact of ETOH [alcohol] on disorder."  (T. 348).  In a December 2, 1999 letter addressed "To Whom It May Concern," Dr. Wilson concluded:

> Joseph Casey is a long established patient of the Rensselaer Health Center.  Mr. Casey suffers with several chronic health ailments including seizure disorder.  He is not employable at this time.  Once Mr. Casey establishes himself with Medicaid, we will again attempt to arrange diagnostic testing for Mr. Casey.

 (T. 342).

At the agency's request, Dr. George Wootan examined plaintiff consultatively on July 29, 1999.  (T. 300-08).  Dr. Wootan completed two reports. (T. 300-303, 305-308).  One report was an "Internal Medicine Examination" and the other report was a "Neurological Examination." *Id.*  Plaintiff told Dr. Wootan that the seizures

---

[1] It is unclear whether Dr. Wilson is making a statement that plaintiff was disoriented and made no sense during the examination or whether plaintiff was describing his mental state during the seizures he was describing. (T. 343).

occurred "about every six months" during both the day and night.  (T. 300, 305).

Physical examination findings were normal, and Dr. Wootan did not impose any

physical restrictions.  (T. 301-02, 306-07).  Dr. Wootan concluded:

> From a physical standpoint, I see no reason why the claimant is not able
> to engage in activities which require sitting, standing, walking, and
> stairs.
> He can lift and carry without restriction.  He can handle small objects
> without difficulty.
> He can bathe and care for himself.

(T. 302-03 (Internal Medicine Report), 307-08 (Neurologic Report).

Also at the agency's request, Annette Payne, a psychologist, examined

plaintiff consultatively on August 3, 1999.  (T. 310-18).  Dr. Payne found plaintiff to

be a "very poor historian," noting that "[a] lot of his recollections were not consistent

with the history he gave."  (T. 310, 314).  As an example, Dr. Payne noted that

plaintiff "denied any previous inpatient psychiatric hospitalizations.  However, later

during the evaluation he stated that the police brought him to Samaritan Hospital and

he stayed there for three nights in the 'looney bin.'"  (T. 310, 314).  Dr. Payne

concluded:

> Mr. Casey's cognitive and memory difficulties are severely limiting.  He
> [would] not [be] able to follow and understand simple directions and
> instructions.  He could not perform simple rote tasks under supervision.
> He could not maintain the attention and concentration for job tasks.  He
> could not make appropriate job decisions.  He could not consistently
> perform tasks.  He could not learn new tasks.  He could not complete
> complex tasks independently.  He could not relate with coworkers and
> supervisors.  He could not deal with the normal stresses of a competitive
> workplace.  His reports appear consistent with his presentation.

(T. 312-13, 317).

6

Dr. Payne stated that plaintiff "would benefit from some outpatient alcohol treatment" and from "some vocational counseling to determine what types of jobs he may be appropriate for given his medical limitations and severe memory difficulties."  (T. 313, 317).

On August 31, 1999, Dr. Richard B. Weiss, a State agency review physician, completed a mental residual functional capacity ("RFC") form.  (T. 338-41).  The form indicates that plaintiff was limited markedly in his abilities to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and to sustain an ordinary routine without special supervision.  (T. 338). Dr. Weiss completed a "Psychiatric Review Technique" form. (T. 319-27).  This form is utilized by the agency to assist in determining whether a claimant exhibits the signs and symptoms of a psychiatric Listed Impairment.  Although Dr. Weiss found that plaintiff exhibited some of the elements of "Organic Mental Disorders,"[2] "Personality Disorders,"[3] and "Substance Addiction Disorder,"[4] the only functional limitations cited were not sufficient to bring plaintiff within the category of a Listed Impairment.[5]  Dr. Weiss stated that plaintiff's organic mental disorder was " . . . 2° to

---

[2] 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.02.

[3] 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.08.

[4] 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.09.

[5] In order to have a Listed Impairment, a claimant must not only exhibit the symptoms of the impairment itself, but must also have the requisite functional limitations resulting from that impairment. *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00(A).  The functional limitation requirements from the regulations are listed on page 326 of the record, and a claimant must suffer listing severity limitations in at least *two* of the categories.  According to Dr. Weiss's report, this plaintiff had listing severity limitations in only *one* category. (T. 326).  Dr. Weiss found that plaintiff would have "frequent" deficiencies of concentration, persistence or pace resulting in

drinking." (T. 321).

On September 2, 1999, Dr. Weiss completed a physical RFC form in which he finds that plaintiff has no exertional, manipulative, visual, or communicative limitations, but that he should never perform climbing or balancing, and should avoid all exposure to hazards (machinery, heights, etc.).  (T. 330-37).

On January 6, 2000, plaintiff was admitted to Albany Medical Center Hospital due to Dilantin toxicity.  (T. 363-420).  According to hospital records, plaintiff "stopped taking Dilantin on his own and had seizures.  He [then] took [an] overdose of Dilantin and became toxic."  (T. 366).  Plaintiff's condition was monitored and upon release two days later, he was referred to a "neuro clinic."  (T. 366, 372).

In March of 2000, Plaintiff first saw Dr. Matthew Murnane, an assistant professor of neurology at Albany Medical College.  (T. 358).  Dr. Murnane sent plaintiff for an EEG, which showed normal results.  (T. 582).  Approximately two months later, on May 23, 2000, Plaintiff was admitted to Albany Medical Center Hospital due to a "breakthrough seizure."  (T. 510-13).  He was discharged the following day.  (T. 510).

In a "Seizures Residual Functional Capacity Questionnaire" dated July 14, 2000, Dr. Murnane described plaintiff's condition as epilepsy, not otherwise specified, which was being treated with antiepileptic medications, Trileptal and Dilantin, with the latter being tapered off.  (T. 519-20).  Dr. Murnane stated that plaintiff "is limited in [his] ability to perform work or routine activities of daily

---

failure to complete tasks in a timely manner (in work settings or elsewhere).  (T. 326).

living" due to his seizures.  (T. 520).  It was also indicated that plaintiff's seizures were likely to disrupt the work of co-workers and that plaintiff was unable to work at heights, work with power machines that require an alert operator, or operate a motor vehicle; but plaintiff would not need more supervision at work than an unimpaired worker, could take a bus alone, and was capable of tolerating low stress jobs.  (T. 521-22).  Dr. Murnane also indicated that plaintiff "probably" would need to take "rare" breaks lasting less than thirty minutes.  (T. 521).

On October 25, 2000, Dr. Murnane noted that plaintiff does not yet have full control of his seizure disorder though has had "some improvement" since changing medications and was tolerating Trileptal "well".  (T. 601).  On September 13, 2002, Dr. Murnane recommended that plaintiff not operate "heavy machinery, especially if there [are] movable parts" and not climb heights.  (T. 605).  He noted that plaintiff "has a history of meningitis with resultant cognitive problems.  As a result he has difficulties with attention[,] limiting any work requiring multi-tasking."  (T. 605).

On April 10, 2003, Dr. Murnane noted that plaintiff "remains seizure free on Trileptal" with no reported adverse effects.  (T. 640).  Dr. Murnane diagnosed plaintiff as suffering from a "not well characterized epilepsy syndrome which is ***fully controlled*** with Trileptal monotherapy."  (T. 640) (emphasis added).  He concluded:

> Concerning his ability to work, I cannot say he is absolutely disabled from working; however, he should not operate heavy machinery or climb heights.  Also, he has demonstrated that he is unable to keep any sort of schedule and cannot work in a job that requires maintaining a regular work schedule.  He has had multiple bouts of status epilepticus which would likely cause[] some brain damage on top of preexisting damage related to his history of childhood meningitis.  In effect he is totally disabled.

(T. 640-41).

At the agency's request, John J. Seltenreich, a psychologist, examined plaintiff consultatively on July 9, 2003.  (T. 613-23).  Dr. Seltenreich noted that plaintiff "was somewhat hard to evaluate in that his girlfriend would interrupt him and contradict him at times . . . Claimant presents himself as more functional than his girlfriend."  (T. 616).  Dr. Seltenreich found that plaintiff's attention and concentration were "[i]ntact" and that his recent and remote memory skills were "[g]rossly intact."  (T. 615).  Dr. Seltenreich diagnosed plaintiff as suffering from alcohol dependence, status unknown, and cognitive disorder, not otherwise specified.  (T. 616).  He concluded:

> Claimant is able to follow and understand simple directions and instructions, as well as perform simple and rote tasks under supervision. He should be able to maintain attention and concentration for tasks and consistently perform simple tasks when physically able.  He has a limited ability to learn new tasks and should not be expected to perform complex tasks independently.  He appears to be able to make appropriate decisions independently.  He reports to be able to relate adequately with others and denies having any major problems dealing with stress.  The results of the present evaluation do not appear to be consistent with allegations of anxiety disorder.

(T. 615).

On July 14, 2003, Dr. Seltenreich completed a form entitled "Medical Source Statement of Ability to do Work-Related Activities (Mental)."  This form indicates that plaintiff has no limitations in his abilities to understand, remember, and carry out short, simple instructions, and to make judgments on simple work-related decisions. (T. 622).  Dr. Seltenreich also indicated that plaintiff had "moderate" limitations in

his abilities to understand, remember, and carry out detailed instructions.  (T. 622).

It was also indicated that plaintiff had no limitations in his ability to interact

appropriately with the public, supervisor(s), or co-workers, but had "slight"

limitations in his abilities to respond appropriately to work pressures in a usual work

setting and respond appropriately to changes in a routine work setting.  (T. 623).  Dr.

Seltenreich stated that the assessment was supported by plaintiff's "limited cognitive

abilities."  (T. 623).

## DISCUSSION

**1.   Disability Standard**

To be considered disabled, a plaintiff seeking disability insurance benefits or

SSI disability benefits must establish that he is "unable to engage in any substantial

gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than twelve months . . . ."  42

U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot,
> considering his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the immediate area
> in which he lives, or whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520

and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity. If he is not, the [Commissioner]
> next considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to basic work activities.
> If the claimant suffers such an impairment, the third inquiry is whether,
> based solely on medical evidence, the claimant has an impairment which
> meets or equals the criteria of an impairment listed in Appendix 1 of the
> regulations.  If the claimant has such an impairment, the
> [Commissioner] will consider him disabled without considering
> vocational factors such as age, education, and work experience; . . . .
> Assuming the claimant does not have listed impairment, the fourth
> inquiry is whether, despite the claimant's severe impairment, he has the
> residual functional capacity to perform his past work.  Finally, if the
> claimant is unable to perform his past work, the [Commissioner] then
> determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,

416.920.

The plaintiff has the burden of establishing disability at the first four steps.

However, if the plaintiff establishes that his impairment prevents him from

performing his past work, the burden then shifts to the Commissioner to prove the

final step.  *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

**2.**     **Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine

whether the correct legal standards were applied and whether substantial evidence

supports the decision.  *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992)

(citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court

may not affirm an ALJ's decision if it reasonably doubts whether the proper legal

standards were applied, even if the decision appears to be supported by substantial

evidence.  *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial

factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)(citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *William*s, 859 F.2d at 258. However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

3.    **New and Material Evidence**

Plaintiff submitted a large volume of evidence for the court to "consider." (Dkt. Nos. 12[6] & 13).  It appears that counsel believes that if this court accepts the "new evidence" it can be considered along with the evidence of record.  However, the Social Security Act does not permit this type of consideration.  Instead, the Act provides that a court may ***remand*** a case to the Commissioner to consider additional evidence, but only if the evidence is new, material, and there is good cause for failure to incorporate that evidence into a prior proceeding.  42 U.S.C. § 405(g) (sentence six).

The Second Circuit has developed a three-part test showing what is required to support a sentence six remand.  *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988).  First, the evidence must be "new" and not merely cumulative of what is already in the record.  *Id.* (citing *Szubak v. Secretary of Health & Human Services*, 745 F.2d 831, 833 (3d Cir. 1984)).  Second, in order for the new evidence to be "material," it must be both relevant to the claimant's condition during the time period for which benefits were denied and probative."  *Id.* (citing *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975)).  The Second Circuit has also held that the concept of "materiality" requires a finding that there is a reasonable possibility that the new evidence would have influenced the Commissioner to decide the claimant's

---

[6] Docket Nos. 10 and 12 contain plaintiff's memorandum in support of his "motion" for judgment on the pleadings.  Plaintiff's counsel re-filed his memorandum with the court due to an error with the first filing.  In Docket No. 12, plaintiff's counsel states in a letter that he is serving the "Appendix" by Federal Express. (Dkt. No. 12-2).  The Appendix will be maintained in the Clerk's Office and is not for electronic viewing. (Dkt. No. 12).

application differently.  *See Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991).  Third, the plaintiff must show that there is good cause for failing to present the evidence earlier.  *Lisa v. Secretary of the Dep't of Health & Human Services*, 940 F.2d 40, 43 (2d Cir. 1991) (quoting *Tirado*, 842 F.2d at 597).

The court notes that in this District, General Order 18 requires that when a plaintiff wishes to support a social security appeal with new evidence, the evidence "***must be accompanied by a legal memorandum setting forth an argument for the acceptance of the new evidence based upon the three-part showing required by the regulations***." General Order No. 18 at p.3 (N.D.N.Y. Sept. 12, 2003)(emphasis added).  The new evidence ***and accompanying memorandum*** must be filed and served upon the counsel for the Commissioner of Social Security. *Id.*

In this case, counsel submitted an appendix and supplemental appendix containing a total of one hundred and sixty-seven pages of additional evidence for the court's consideration.  (Dkt. Nos. 10 & 13).  However, counsel failed to submit a legal memorandum setting forth an argument for the acceptance of the additional evidence as required by General Order 18.[7]  Nevertheless, the court will review the additional evidence submitted by plaintiff.

### A.   Evidence in The Appendix (Dkt. No. 12)

The evidence contained in the Appendix consists of an October 12, 2004 report by Dr. Murnane; two emergency room reports (12/24/03 and 1/30/04); an

---

[7] Plaintiff's Memorandum of Law contains a "Point III" that merely states: "The evidence sought to be considered, and to justify reversal and/or remand is not cumulative." (Dkt. No. 12 at 15).  This one sentence does not comply with General Order 18.  There was no memorandum of law accompanying the Supplemental Appendix.

April 8, 2004 report written by Dr. Murnane on a Rensselaer County Social Services form; and three Albany Medical Center discharge summaries and hospital reports (4/13/04, 7/13/04; and 9/14/04).  The only evidence in the appendix that pre-dates the ALJ's decision relates to plaintiff's admission to St. Peter's Hospital on December 24, 2003, and the result of a CT scan of plaintiff's head dated May 22, 2000.[8] (Dkt. No. 10, Appendix ("A-") at 3-17, 30, 33, 61).[9]

The court notes that the fact that a document was generated after the ALJ rendered his decision does not necessarily mean that it has no bearing on the time period in question. *Pollard v. Halter*, 377 F.3d 183, 193-94 (2d Cir. 2004). In *Pollard*, the Second Circuit stated that even evidence relevant to a claimant's condition after the expiration of insured status may be relevant if it discloses the severity and continuity of impairments that existed previously. *Id. See also Williams v. Comm'r of Soc. Sec.*, 236 Fed. Appx. 641, 644 (2d Cir. 2007)(citing *Pollard*, 377 F.3d at 193 for the proposition that evidence generated after an ALJ's decision could not be deemed irrelevant solely because of timing).

The ALJ's decision in this case is dated January 29, 2004. (T. 7-20).  A review of the December 24, 2003 emergency room records shows that plaintiff had a seizure on that date, however, the record also states that plaintiff was ***not sure*** when he had his last seizure. (A-4).  Although it is true that plaintiff had memory problems, the

---

[8] It appears that this document was included as part of the Albany Medical Center records dated September 14, 2004 in order to compare the May 22, 2000 CT scan to the September 14, 2004 CT scan. (A-59-62).  Plaintiff does not appear to be submitting this as a separate record.

[9] Citations to the appendix and supplemental appendix will be cited as "A-__" followed by the page number.  (*See* Dkt. Nos. 10 & 13).

record also states that plaintiff "may have missed" taking his medication and drank beer the previous day. (A-4).  It was also noted that plaintiff estimated that his last seizure occurred *one year earlier*. (A-8).  Plaintiff was discharged later the same day in a stable and improved condition. (A-6).  He was advised simply to continue taking his current medications, buy a "pill counter," and contact his treating physician, Dr. Murnane. (A-17).

The January 30, 2004 emergency room report states that plaintiff had another seizure, however, the report also states that plaintiff was "found [with] a bottle of alcohol by [his] side." (A-23).  This document does *not* show that his pre-existing condition was more serious than initially thought.  Rather, it shows that, as before, there were precipitating, controllable actions that could cause plaintiff's seizures.  These actions consisted of missing medication or drinking, each of which plaintiff could control, and neither of which would have changed the ALJ's previous decision.  Thus, these reports are not "material" and are not a basis to order remand under the statute.

Dr. Murnane's April 8, 2004 report, written on a Rensselaer County Social Services form states that from a neurological standpoint, "Mr. Carey can work as his seizures are under control." (A-39).  The report further states that plaintiff does have some limitations due to impaired memory and concentration, and can not perform jobs that require "multi-tasking."  The doctor stated that plaintiff could not adhere to a rigid schedule. *Id.*  Dr. Murnane also stated that plaintiff might have some significant cognitive and psychiatric problems, but that was "outside the scope" of

Dr. Murnane's practice. *Id.*  Dr. Murnane recommended a psychiatric and neuropsychiatric evaluation for a better assessment. *Id.*

Although this report by Dr. Murnane is dated in April of 2004, many of the statements in the report appear to be identical to statements previously made by this doctor, including the fact that plaintiff should not operate heavy machinery and could not perform work involving "multi-tasking." *Compare* (A-39) *with* (T. 605).  Thus, this report is not "new" or "material" and this court finds that it would not have altered the ALJ's decision.

Plaintiff suffered another seizure in April of 2004 and was admitted to Albany Memorial Hospital. (A-45-48).  The next set of documents indicates that plaintiff had a seizure in July of 2004, for which he spent two days in Albany Medical Center Hospital. (A-49-55).  At that time, plaintiff reported missing his last dose of Trileptal. (A-49, 51).  Dr. Ki Tae Mok suggested changing plaintiff's medication. (A-49).  On July 14, 2004, Dr. Mok wrote that plaintiff's seizure was probably "due to not taking seizure meds." (A-54).

Plaintiff suffered another seizure in September of 2004 and was again admitted to the hospital. (A-58-111).  On September 14, 2004, an MRI of plaintiff's brain showed "notable enlargement of the temporal horns, more on the right, compared to study done approximately four years ago." (A-58).  A CT scan done at the same time was "stable" with no "acute findings." (A-59).  The scan was compared to plaintiff's May 2000 CT scan. *Id.* (A-59, 60-61).  Another report stated that plaintiff's seizure disorder was secondary to non-compliance in the past. (A-63).  On September 15,

2004, an occupational therapy cognitive evaluation showed that plaintiff's deficits were listed as "none to mild" in many areas including remote and recent memory, temporal awareness, simple money skills, and simple problem solving. (A-66). He had moderate to severe deficits in multiple digit math skills, moderate and complex concrete problem solving, mental flexibility, and abstract reasoning. (A-66).

Another test performed during plaintiff's September 2004 hospitalization showed moderate to severe deficits in recall of recent events as well as moderate to severe deficits in sequential reasoning and deductive problem solving. (A-74). Plaintiff reported reduced cognitive function due to the "most recent seizure," but also reported cognitive impairments for the last fifteen years. (A-74). However, on September 18, 2004, one of the plaintiff's progress notes states that plaintiff has a "mild memory impairment." (A-78). Plaintiff's discharge instructions stressed medication compliance. (A-82).

Finally, Dr. Murnane's October 12, 2004 letter states that plaintiff has a seizure disorder that is not fully controlled, although "at one point" he did have good control of his seizures with the Trileptal. (A-1). Dr. Murnane then states "[plaintiff]" is *currently unable to work*." *Id.*(emphasis added). Dr. Murnane also states that plaintiff's memory problems were longstanding, "*and have been worse over time.*" *Id.* (emphasis added). This letter from Dr. Murnane is evidence that plaintiff's condition was controlled at one time, and that the condition has gotten worse.

This information is consistent with the other evidence in the Appendix and the Supplemental Appendix and may be why plaintiff was subsequently granted benefits

beginning in 2005.  However, Dr. Murnane's statement that plaintiff has gotten worse over time does not support a finding that this evidence is "material" to the time period in question in this application.

This court finds, after a review of the documents contained in the Appendix, that the evidence presented, while "new," is not "material" to plaintiff's current application.  Although, it is evident from these reports that plaintiff continued to have seizures after the ALJ's decision, and his condition may have worsened, the reports did ***not*** show that plaintiff's disorder was disabling at the time of the prior reports.  Some of the evidence even shows that the plaintiff's seizures could have been caused by external and controllable factors as indicated in the reports that were considered by the ALJ.  The new evidence would not have affected the ALJ's decision.

### B.    Evidence in the Supplemental Appendix (Dkt. No. 13)

As stated by plaintiff's counsel, the evidence in the supplemental appendix relates to plaintiff's ***subsequent application*** for Social Security benefits.[10]  It appears

---

[10]  It is unclear whether the material in the first Appendix was also included in plaintiff's subsequent application, although it is likely since one of the reports from plaintiff's July 2004 hospitalization contained in the Appendix is repeated in the Supplemental Appendix.  The supplemental appendix contains the following: "Report of Contact" completed by "E. Wertime," dated December 14, 2004; notice of an award of monthly child's benefit to Kalen Casey dated June 13, 2005; a May 7, 2005 notice to plaintiff of an award of Social Security benefits beginning May of 2005; functional report completed by plaintiff on February 9, 2005; seizure disorder questionnaire completed by plaintiff dated January 31, 2005; work history report completed by plaintiff dated February 5, 2005; mental RFC assessment and psychiatric review technique form completed by Dr. James Alpert dated March 24, 2005; evaluation report completed by Dr. Robert C. Williams dated March 15, 2005; Albany Medical Center Hospital emergency room records and test results dated January 23, 2005; Albany Medical Center Hospital discharge records dated July 13, 2004; and plaintiff's employment history record dated January 8, 2005.  (A-114-67).

from these records that plaintiff was granted benefits beginning in 2005. (A-118).
All the reports were written after the Commissioner's decision in this case.  The
court must, therefore, determine whether the reports relate to the period in question,
notwithstanding the date that they were written.

In a report, dated March 25, 2005, written by one of the agency's medical
consultants, it is noted that "recently [plaintiff's] seizures became worse." (A-137).
Several of the reports deal with plaintiff's back pain and other injuries due to a fall
that he suffered in January of 2005. (A-145-51, 155-57).  This information clearly
does not relate to claimant's condition **during the time period for which benefits
were denied.**  The court also notes that one of the reports from the July 2004 seizure
was repeated in the Supplemental Appendix. (A-160-61).  Accordingly, this evidence
is not material and provides no basis for remand.

Thus, plaintiff's submissions do not meet the standard for a remand to consider
new and material evidence, and the court may proceed to consider plaintiff's other
arguments.

4.   **Treating Physician**

While a treating physician's opinion is not binding on the Commissioner, the
opinion must be given controlling weight **when it is well supported by medical
findings and not inconsistent with other substantial evidence**.  *See Veino v.
Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d).  If the treating
physician's opinion is contradicted by other substantial evidence, the ALJ is not
required to give the opinion controlling weight.  *Halloran v. Barnhart*, 362 F.3d 28,

32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that the report is rejected. *Id.* An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

If the treating physician's opinion is not given controlling weight, the ALJ must assess the following factors: the length of the treatment relationship; the frequency of examination for the condition in question; the medical evidence supporting the opinion; the consistency of the opinion with the record as a whole; the qualifications of the treating physician; and other factors tending to support or contradict the opinion. 20 C.F.R. §§ 404.1527(d)(2)-(d)(6); 416.927(d)(2)-(d)(6). Failure to follow the proper standard is a ground for reversal. *Barnett v. Apfel*, 13 F. Supp. 2d 312, 316 (N.D.N.Y. 1998)(citation omitted).

In this case, plaintiff states that the ALJ failed to give "proper" weight to the treating sources' opinions. (Dkt. No. 12 at pp. 8, 11-12). In his decision, the ALJ found that the opinions of plaintiff's treating sources, Dr. Murnane and Dr. Wilson, were entitled to "little weight." (T. 16).

### A.    Dr. Murnane

On April 10, 2003, Dr. Murnane found that:

Concerning [plaintiff's] ability to work, I cannot say he is absolutely disabled from working; however, he should not operate heavy machinery or climb heights. Also, he has demonstrated that he is unable to keep any sort of schedule and cannot work in a job that requires maintaining a regular work schedule. He has had multiple bouts of status epilepticus which would likely cause[] some brain damage on top of preexisting damage related to his history of childhood meningitis. In effect he is totally disabled.

(T. 640-41).  The ALJ found that Dr. Murnane's opinion was entitled to "little weight," explaining that the opinion was contradictory, and unsupported by Dr. Murnane's own progress notes and objective medical findings in the record.  (T. 16). In so finding, the ALJ specifically reviewed the evidence from the other physicians *and* specifically stated why he gave another source's opinion "great" weight.  (*See* T. 10-16).  For the following reasons, the court finds that the ALJ's conclusion was both properly explained and supported by substantial evidence.

Regarding Dr. Murnane's opinion that plaintiff was "totally disabled," the ALJ found that Dr. Murnane's opinion was contradictory.  (T. 16).  As the ALJ pointed out, Dr. Murnane concluded, "In effect he is totally disabled;" however earlier in the same report, Dr. Murnane stated, "I cannot say he is absolutely disabled from working."  (T. 640-41).  As will be discussed below, the ALJ examined the record in great detail and compared many aspects of Dr. Murnane's opinion to the other evidence.  (T. 11-16).  The ALJ carefully examined the elements of Dr. Murnane's opinion, and the ALJ properly cited the contradictory evidence upon which he was relying.  The ALJ's assignment of "little weight" to Dr. Murnane's opinion is supported by substantial evidence.

In any event, the court notes that the ALJ was not bound by these statements, since they directly address the ultimate issue reserved for the Commissioner.  20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).  The statement that plaintiff was disabled "in effect" is unclear and this general conclusion does not meet the standard articulated in the regulations for

disability.

The ALJ accepted Dr. Murnane's opinion that plaintiff "should not operate heavy machinery or climb heights."  The ALJ stated that plaintiff "cannot work at heights or with dangerous machinery, nor can he operate a motor vehicle . . . ."  (T. 18).  The ALJ found that Dr. Murnane's opinion that plaintiff was "unable to keep any sort of schedule and cannot work in a job that requires maintaining a regular schedule," was not well supported by objective medical evidence.  (T. 16).  The record does not support Dr. Murnane's broad opinion about plaintiff's ability in this regard.

First, the progress note containing this opinion offers little in the way of supporting evidence.  Dr. Murnane simply stated that plaintiff "has had multiple bouts of status epilepticus which would likely cause[] some brain damage on top of preexisting damage related to his history of childhood meningitis."  (T. 641).  It is unclear how this information supports the limitation in question.

Second, the ALJ found that Dr. Murnane's opinion was not supported by his own records.  (T. 16).  While Dr. Murnane described plaintiff's seizures as "unpredictable" in October of 2000, he changed plaintiff's medication to Trileptal, which resulted in plaintiff's seizures being "well controlled" one year later.  (T. 596, 602).  Moreover, in the same progress note which contains the limitation in question, Dr. Murnane found that plaintiff "remains **seizure free** on Trileptal," and that plaintiff's epilepsy syndrome "is ***fully controlled*** with Trileptal monotherapy."  (T. 640) (emphasis added).  Dr. Murnane also previously indicated that plaintiff was

24

capable of tolerating low stress jobs and would not need more supervision at work than an unimpaired worker.  (T. 521-22).

Other objective medical evidence in the record does not support this limitation. Dr. Seltenreich, a consulting psychologist, found that plaintiff has no limitations in his abilities to understand, remember, and carry out short, simple instructions and make judgments on simple work-related decisions. (T. 622).  Dr. Seltenreich also found that plaintiff was able to follow and understand simple directions and instructions; perform simple and rote tasks under supervision; maintain attention and concentration for tasks; consistently perform simple tasks when physically able; and make appropriate decisions independently.  (T. 615, 619-20).  Additionally, while EEG testing performed in July of 1996 and September of 1997 showed abnormal results, EEG testing performed in July of 1997, June of 1998, and April of 2000 revealed *normal* results.  (T. 165, 177, 505, 517, 582).

The court also notes that plaintiff testified that he worked between twenty and thirty hours a week when needed.  (T. 676).  When discussing a previous cleaning position, plaintiff described no problems maintaining a schedule.  (*See* T. 685-86). Rather, he stated that "the only problem" related to his involvement in a physical altercation with another employee.  (T. 686).  Plaintiff also testified that his seizures were under control, and that he has no "problem" with seizures as long as he takes his medication.  (T. 693).  When asked why he was unable to work a full-time job, plaintiff stated that he was worried about having a seizure, stating he "wouldn't risk anybody's life like that."  (T. 693).

However, plaintiff later admitted that he would be able to perform *any* jobs that would allow him to avoid heights or avoid situations where he would endanger others if he had a seizure.  (T. 693-94).  When asked what type of jobs he could perform, he responded, "***Anything . . . I'm a good worker . . . I could actually do anything***."  (T. 694) (emphasis added).  Even plaintiff's attorney added, "***He could do anything***, Judge," to which plaintiff responded, "***I'm a good worker***, you know." (T. 694) (emphasis added).

Thus, the ALJ's assignment of less than controlling weight to Dr. Murnane's opinion was proper.  The finding was both properly explained and supported by substantial evidence.

### B.   Dr. Wilson

_____The ALJ gave "little weight" to Dr. Wilson's opinion that plaintiff is not employable.  (T. 16).  In a December 2, 1999 letter addressed "To Whom It May Concern," Dr. Wilson stated:

> Joseph Casey is a long established patient of the Rensselaer Health Center.  Mr. Casey suffers with several chronic health ailments including seizure disorder.  ***He is not employable at this time.***  Once Mr. Casey establishes himself with Medicaid, we will again attempt to arrange diagnostic testing for Mr. Casey.

(T. 342) (emphasis added).

As previously noted, the issue of disability is reserved for the Commissioner.  20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); *Snell*, 177 F.3d at 133.  Moreover, "[a] statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  20 C.F.R. § 416.927(e)(1).

Thus, the ALJ committed no error by assigning "little" weight to this opinion because the ALJ was not bound by this opinion. *See id.*

Dr. Wilson's short opinion of September 2, 1999 (T. 342) is somewhat conclusory, and does not give any details about *why* plaintiff is not employable "at this time." Although Dr. Wilson refers to "several chronic health ailments," he does not specify what these ailments are or how serious they are. Dr. Wilson seems to say that further diagnostic testing needs to be done to clarify plaintiff's medical condition.

It is clear from the record that Dr. Wilson was very concerned about plaintiff's use or excessive use of alcohol since there are several notes referring to alcohol use. (T. 345, 346, 347, 348, 349, 350). Dr. Wilson specifically discussed with plaintiff the "negative impact of alcohol use on plaintiff's seizure disorder." (T. 348). In addition, there are references to alcohol rehabilitation treatment at a place referred to as "Seton." Dr. Wilson specifically stated that "I strongly encouraged [plaintiff] seek . . . out" a rehabilitation program. (T. 346). At one point, the notes from St. Peter's Hospital indicate that plaintiff was awaiting Medicaid approval for a twenty-eight day alcohol rehabilitation program. (T. 347-49). The sparse records from the Rensselaer Health Center of St. Peter's Ambulatory Care Network do not provide much support for Dr. Wilson's opinion, and this court finds that the ALJ was justified in giving "little weight" to that opinion.

5. **Credibility**

"An [ALJ] may properly reject [subjective complaints] after weighing the

objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record.  *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. §§ 404.1529(a), 416.929(a).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work.  *Id.* §§ 404.1529(c), 416.929(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any

28

medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3).

In this case, the ALJ found that plaintiff had a medically determinable impairment that resulted in a need to avoid working at heights and with dangerous machinery, and to operate a motor vehicle.  (T. 18).  However, the ALJ questioned plaintiff's credibility regarding *the alleged inability to focus or remember*.  (T. 14-18).  The ALJ based this finding on medical evidence as well as inconsistent statements by plaintiff.  For the following reasons, the court finds that the ALJ's credibility determination is supported by substantial evidence in the record.

First, the medical evidence cited by the ALJ provides substantial support for the credibility determination.  The ALJ noted that Dr. Seltenreich, a consultative physician, found that plaintiff's attention and concentration were intact "in that he could perform serial 3s."  (T. 12, 14, 615).  Tests also showed that plaintiff's recent and remote memory skills were "[g]rossly intact."  (T. 615).  Dr. Seltenreich also found that plaintiff has *no limitations* in his abilities to understand, *remember*, and carry out short, simple instructions and make judgments on simple work-related decisions.  (T. 622).  He also found that plaintiff is able to follow and understand simple directions and instructions; perform simple and rote tasks under supervision; *maintain attention and concentration for tasks*; consistently perform simple tasks when physically able; and make appropriate decisions independently.  (T. 615, 619-

20).

The ALJ also stated that plaintiff's treating physician, Dr. Murnane, repeatedly described plaintiff as only "mildly inattentive" and found that plaintiff would be limited in performing any work requiring "***multi-tasking***."  (T. 15, 597, 600, 603, 605 640, 643) (emphasis added).  Moreover, while Dr. Murnane indicated in a seizure questionnaire that plaintiff had a "short attention span" and "memory problems," he gave no indication that plaintiff was unable to focus or remember.  (T. 648).  Rather, he indicated that plaintiff was capable of tolerating low stress jobs and would not need more supervision at work than an unimpaired worker.  (T. 521-22, 648).

Second, the ALJ cited inconsistent statements made by plaintiff which further support the ALJ's credibility determination.  (T. 14-18).  This court notes that "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."  S.S.R. 96-7p, 1996 WL 374186, at *5 (S.S.A. 1996).

The ALJ pointed out that Dr. Payne stated that plaintiff made inconsistent statements.  (T. 14).  Dr. Payne found:

> [a] lot of [plaintiff's] recollections ***were not consistent*** with the history he gave.  For example, he denied any previous inpatient psychiatric hospitalizations.  However, later during the evaluation he stated that the police brought him to Samaritan Hospital and he stayed there for three nights in the 'looney bin.'

(T. 310) (emphasis added).  The ALJ found that plaintiff also  made inconsistent statements at the hearing.  (T. 16-17).  When asked whether he was looking for work,

he explained, "I tried but . . . I have a bad memory, a short-term memory." (T. 678). However, he later stated that he was not hired for one job due to an outstanding warrant for child support, stating "[T]hey wouldn't hire me *because of that warrant*." (T. 695) (emphasis added). He also stated that while employed in a previous cleaning position, "the only problem" he had was being involved in a physical altercation with another employee. (T. 685-86).

Moreover, when asked why he was unable to work full-time, plaintiff testified to a fear of experiencing a seizure, stating "I wouldn't risk anybody's life like that." (T. 693). However, plaintiff stated that *he has no "problem" with seizures* as long as he takes his medication and that he has not had a seizure in almost one year. (T. 682, 693) (emphasis added). As stated above, plaintiff testified that he could do *any* jobs that did not involve working at heights and in situations where he would endanger others if he had a seizure, and asserted that he was a good worker. (T. 693-94) (emphasis added).

Finally, although declining to deny benefits solely on the basis of plaintiff's performance of substantial gainful activity, the ALJ noted and considered that during 2002 and 2003 plaintiff worked, with income that constituted "substantial gainful activity." (T. 9-10, 19). In fact, plaintiff was working at the time of the first ALJ's hearing in June of 2003. Given the medical findings and inconsistencies in the record, the ALJ's determination of plaintiff's credibility is, therefore, supported by substantial evidence.

**6.    Residual Functional Capacity**

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§ 404.1545; 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145 (N.D.N.Y. 1999)(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities.  *Verginio v. Apfel*, No. 97-CV-456, 1998 WL 743706, at *3 (N.D.N.Y. Oct. 23, 1998); *LaPorta*, 737 F. Supp. at 183.

In this case, the ALJ found that plaintiff could perform simple, low stress work at the medium level of physical exertion which does not involve working at heights or with dangerous machinery, or operating a motor vehicle.  (T. 19).  Plaintiff's main challenge to the RFC determination appears to be that he is unable to work in a competitive workplace.  (Dkt. No. 10 at p. 7).  It is unclear on what ***specific*** evidence plaintiff relies to support his claim.

To the extent that plaintiff relies on Dr. Murnane's opinion, the court has already found that the ALJ properly afforded little weight to this opinion.  To the extent that plaintiff relies on the additional evidence submitted directly to the court, the court has found that it will not consider this evidence, and thus, it provides no basis for remand.  Additionally, plaintiff's claim is belied by his testimony at the hearing in which he admitted being able to work.  Thus, the ALJ's RFC finding is supported by substantial evidence.

WHEREFORE, based on the findings in the above Report, it is hereby

RECOMMENDED, that the decision of the Commissioner be **AFFIRMED**

and the complaint (Dkt. No. 1) be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to

file written objections to the foregoing report.  Such objections shall be filed with the

Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN**

**DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d

85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d

15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: December 10, 2007

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge